UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
TEXARKANA DIVISION

| | | |
|---|---|---|
| HOPKINS & RAINES, INC. | § | |
| **Plaintiff** | § | |
| | § | |
| vs. | § | Case No.  5:14-cv-110-CMC |
| | § | |
| LAKELAND MOTORS d/b/a | § | |
| LAKELAND CHRYSLER JEEP | § | |
| **Defendant** | § | |

## <u>ORDER</u>

Before the Court are the following pending motions:

**(1)  Counter-claim Defendant Hopkins & Raines, Inc.'s "No-Evidence" Motion for Summary Judgment (Docket Entry # 48); and**

**(2)  Defendant Lakeland Motors' Motion for Final Summary Judgment (Docket Entry # 53).**

The Court, having reviewed the relevant briefing, issues the following order.[1]

## I. BACKGROUND

Plaintiff Hopkins & Raines, Inc. ("HRI" or "Plaintiff") filed its case in the 5th Judicial

District Court of Bowie County, Texas against Undrae Stevenson ("Stevenson")[2] and Defendant

Lakeland Motors d/b/a Lakeland Chrysler Jeep ("Lakeland" or "Defendant"), alleging claims of

trade secret misappropriation, breach of contract, and conspiracy to commit interference. HRI is

a marketing and advertising company and provides consulting and related services to automotive

---

[1] On February 11, 2016, the above-entitled and numbered cause of action was referred to the undersigned in accordance with 28 U.S.C. § 636(c) and the consent of the parties.

[2]  Pursuant to HRI's Notice of Voluntary Dismissal of Defendant Undrae Stevenson, the Court has dismissed without prejudice all of HRI's claims against Stevenson.  (Docket Entry # 36).

1

dealers in marketing, sales, management, and training, including services related to sales promotions and events. Lakeland is an automobile dealership based in Florida.

According to the Original Petition filed in state court, HRI and Lakeland entered into a Client Agreement for HRI to provide its services at a dealership owned by Lakeland. HRI alleges Lakeland agreed it would not hire an HRI employee or independent contractor during the term of the Client Agreement or for twelve months thereafter. (Orig. Pet. at 4, ¶ 12). HRI alleges Lakeland agreed not to compensate any HRI employee, independent contractor, or affiliate outside the terms of the agreement. *Id*.

HRI further alleges that during the term of the Client Agreement, Stevenson, who was an independent contractor for HRI at the time and had "accumulated years' worth of learning and implementing HRI's confidential . . . methods," was selected as the on-site representative at the Lakeland dealership. *Id*. at 5, ¶ 13. HRI alleges Stevenson planned on breaching his agreement and relationship with HRI prior to or shortly after he began his work as the on-site representative at Lakeland. *Id*.

At some point, the Client Agreement between HRI and Lakeland was terminated. *Id*. at 5, ¶ 14. According to HRI, Stevenson was working for and being compensated by Lakeland in direct violation of the Client Agreement. *Id*. HRI also claims Stevenson and Lakeland "misappropriated proprietary information of HRI, including confidential customer lists, pricing information, promotional methods for print and electronic media, policies and procedures regarding training sales managers and personnel, billing practices, accounts receivables, and client relationships gained only through HRI business development." *Id.* HRI seeks $500,000 in liquidated damages for breach of contract, as well as damages for trade secret misappropriation and conspiracy to commit interference, attorney's fees, court costs, and punitive damages.

Lakeland removed the case to this Court on August 20, 2014. Seven days later, Lakeland filed its answer. At that time, Lakeland did not allege any counterclaims. On June 29, 2015, the deadline to amend pleadings, Lakeland filed its Amended Answer to HRI's Original Petition, asserting counterclaims against HRI and its counsel. On August 17, 2015, Lakeland amended its answer and dismissed the counterclaims against HRI's counsel. The parties have filed cross motions for summary judgment.

## II. SUMMARY JUDGMENT STANDARD

The Court will apply the well settled summary judgment standards. The purpose of summary judgment is to isolate and dispose of factually unsupported claims or defenses. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). Summary judgment is proper if the pleadings, the discovery and disclosure materials on file, and any affidavits "[show] that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The trial court must resolve all reasonable doubts in favor of the party opposing the motion for summary judgment. *Casey Enterprises, Inc. v. American Hardware Mut. Ins. Co.*, 655 F.2d 598, 602 (5th Cir. 1981) (citations omitted). The substantive law identifies which facts are material. *Anderson,* 477 U.S. at 248.

The party moving for summary judgment has the burden to show that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Id.* at 247. If the movant bears the burden of proof on a claim or defense on which it is moving for summary judgment, it must come forward with evidence that establishes "beyond peradventure *all* of the essential elements of the claim or defense." *Fontenot v. Upjohn Co*., 780 F.2d 1190, 1194 (5th

Cir. 1986). But if the nonmovant bears the burden of proof, the movant may discharge its burden by showing that there is an absence of evidence to support the nonmovant's case. *Celotex*, 477 U.S. at 325; *Byers v. Dallas Morning News, Inc.*, 209 F.3d 419, 424 (5th Cir. 2000). Once the movant has carried its burden, the nonmovant must "respond to the motion for summary judgment by setting forth particular facts indicating there is a genuine issue for trial." *Byers*, 209 F.3d at 424 (citing *Anderson*, 477 U.S. at 248-49). The nonmovant must adduce affirmative evidence. *Anderson*, 477 U.S. at 257.

The Court will consider HRI's motion for summary judgment first.

## III. HRI'S MOTION FOR SUMMARY JUDGMENT

In its Second Amended Answer, Lakeland asserts a counterclaim against HRI under TEX. CIV. PRAC. & REM. CODE § 9.001 *et seq*. Specifically, Lakeland asserts the Original Petition is "groundless" as that term is defined by § 9.001(3) and TEX. R. CIV. P. 13. According to Lakeland, HRI's petition was filed in bad faith and for the purposes of harassment. Thus, Lakeland seeks to recover attorney's fees, expert witness fees, and court costs under TEX. CIV. PRAC. & REM. CODE §§ 9.012 & 10.004. (Docket Entry # 30 at 9-11).

In its "no evidence" motion for summary judgment,[3] HRI implies Lakeland's counterclaims were not timely filed. HRI further asserts Lakeland cannot meet its burden of providing competent summary judgment evidence to support its counterclaims.

In response, Lakeland states it timely filed its counterclaims on June 29, 2015, the Court ordered deadline. In addition, Lakeland asserts it has not received discovery that is material to

---

[3] Although a "no evidence" standard applies in Texas state courts, it has no application to federal courts. *In re Wilshire Homes Houston, Ltd.*, 2013 WL 5162077, * 6 (S.D.Tex. Sept. 11, 2013)(citing *In re Perry*, 2009 WL 2753181 (Bankr. S.D. Tex. Aug. 26, 2009)). Accordingly, the Court will apply the appropriate federal standard to HRI's motion.

Lakeland's counterclaims.[4]  According to Lakeland, HRI never cites to the record in order to demonstrate specifically how the evidence fails to give rise to genuine fact issues; thus, HRI has not carried its summary judgment burden.  The Court agrees.

Although the movant's burden can be satisfied by showing there is an absence of evidence to support the nonmoving party's case on which that party would have the burden of proof at trial, *BWP Media USA, Inc. v. T&S Software Associates, INC.*, 2016 WL 1248908, at *2 (N.D. Tex. Mar. 25, 2016), it is not enough for the moving party to merely make a conclusory statement that the other party has no evidence to prove his case.  The moving party "always bears the initial responsibility of informing the [C]ourt of the basis for its motion, and identifying those portions of the [record] which it believes demonstrate the absence of a genuine issue of material fact." *In re Perry*, 2009 WL 2753181, at *3 (citing *Celotex,* 477 U.S. at 323). "It is not enough to move for summary judgment without supporting the motion in any way or with a conclusory assertion that the plaintiff has no evidence to prove its case." *In re Perry*, 2009 WL 2753181, at *3 (quoting *In re Hydro–Action, Inc.,* 341 B.R. 186, 193 (Bankr.E.D.Tex.2006)). "If the moving party fails to meet this burden, the motion must be denied, regardless of the nonmovant's response." *In re Perry*, 2009 WL 2753181, at *3 (quoting *Tubacex, Inc. v. M/V Risan,* 45 F.3d 951, 954 (5th Cir.1995)).

---

[4] The Court notes Lakeland has filed a motion to compel and for sanctions, seeking the following documents, which Lakeland asserts were confirmed to exist during the depositions of HRI's witnesses and have not been produced: (1) HRI's contracts with Stevenson; (2) recaps for sales events performed by HRI; (3) all but a handful of pay stubs for Stevenson; (4) written customer feedback received by HRI; (5) records from a dispute between HRI and Oxmoor Toyota; (6) documents related to a judgment of HRI against Stevenson; (7) complete copies of text messages from Stevenson to Scott Hopkins; (8) demand letters from HRI to its customers; and (9) text messages between Stevenson and Charles Bergen.

Here, HRI merely lists the elements of the causes of action asserted by Lakeland and states there is no evidence to support the elements. HRI has not demonstrated specifically how the evidence in the record fails to give rise to genuine fact issues. Therefore, HRI has failed to meet the initial burden required of the moving party in a motion for summary judgment.

## IV. LAKELAND'S MOTION FOR SUMMARY JUDGMENT

### A.      Assertions

Lakeland also moves for summary judgment.  Lakeland first asserts HRI cannot prove Lakeland engaged in conspiracy to commit interference. Specifically, Defendant asserts Lakeland had no knowledge of an alleged conspiracy, and HRI has not proved an existing or potential contract subject to interference.

Lakeland further asserts HRI's claim for misappropriation of trade secrets fails as a matter of law, because Lakeland did not discover any HRI trade secrets and it did not use any HRI trade secrets.

Finally, Lakeland asserts HRI has admitted – both in deposition and in its responses to Lakeland's discovery requests - that Lakeland did not breach any Client Agreement with HRI. According to Lakeland, there is no genuine issue of material fact that Lakeland hired, retained, or compensated Stevenson as alleged in HRI's petition.

### B.      Summary judgment evidence

### 1.      Lakeland's evidence

Lakeland's evidence establishes the following.  HRI contracted with Lakeland for HRI to conduct a staffed sales event for Lakeland from December 24 – 31, 2013. *See* Sales Spreadsheet from Port Charlotte sale, LAKELAND MOTORS 000035, attached as Def. Exh. 1. HRI also contracted with Lakeland for HRI to conduct a staffed sales event for Lakeland from January 28,

2014 – February 1, 2014. *See* Client Agreement 1, attached as Def. Exh. 2. HRI contracted with Lakeland for HRI to conduct a staffed sales event for Lakeland Motors from February 25, 2014 – March 1, 2014. *See* Client Agreement 2, attached as Def. Exh. 3. Other than the contracts reflected in Exhibits 2-3 for January 28 – February 1, 2014 and February 25 – March 1, 2014, there is no evidence of any other written contracts between HRI and Lakeland for a staffed sales event.

For each of the staffed sales events reflected in Exhibits 1-3, Stevenson was assigned by HRI as the team leader. For each of the staffed sales events, Lakeland hired and contracted with HRI, not Stevenson. For each of the staffed sales events, Lakeland compensated HRI directly and did not pay or compensate Stevenson. Affidavit of Randall Faison ("Faison Affidavit") at ¶ 9.

In approximately April of 2014, Stevenson was hired by Traffic Jam, a competitor of HRI. HRI has admitted that Traffic Jam, and not Lakeland, hired Stevenson. 11/17/2015 Deposition of Chad Rains ("Rains Depo.") at 60:19-25; 12/16/2015 Deposition of Scott Hopkins ("Hopkins Depo.") at 73:4-10; HRI's verified response to Lakeland Motors' Interrogatory No. 11, attached as Def. Exh. 7.

According to Faison, the General Manager at Lakeland from 2011 until present, Lakeland had previously contracted with Traffic Jam to conduct staffed sales events on a regular basis since at least 2009. 11/10/2015 Deposition of Randall Faison (Faison Depo.") at 36:13-19; Faison Aff. at ¶ 4. Lakeland had contracted with Traffic Jam to do off-site staffed sales events on a regular basis since at least 2013. Faison Depo. at 36:13-19. For each staffed sales event that Traffic Jam performed for Lakeland, Lakeland contracted with Traffic Jam directly and compensated Traffic Jam. *See* Faison Aff. at ¶¶ 6, 13. For each staffed sales event that Traffic

Jam performed for Lakeland, Lakeland had no control over training or compensation of Traffic Jam's independent contractors, including Stevenson. *Id.* at ¶ 14. At no time did Lakeland have any contact with Stevenson where he was retained or hired by Lakeland. *Id.* at ¶ 19; Lakeland's Verified Response to HRI's Interrogatory No. 2, attached as Def. Exh. 9.

In Lakeland's Interrogatory No. 8, Lakeland asked HRI to identify the trade secret(s) of HRI misappropriated by Lakeland, including a specific identification and description of each trade secret and the conduct by Lakeland that HRI contends resulted in misappropriation of HRI's trade secrets. HRI answered as follows: "Super Sale-Sales' process, HRI's management structure, compensation structure, and organizational structure." HRI's Amended Answers to Lakeland's Interrogatories, Exh. B at 4. A Super Sale consists of a large advertising campaign (predominantly direct mail and radio/digital marketing) and a staffed management team and sales force working a 5 or 10-day event on-site at a Super Sale. *Id.* at 4-5. HRI reported having its own commercial print facility and on-site USPS representative in order to have more control and protection over its promotional mailers. *Id.* at 5. HRI stated its proprietary demographic filters are formulas using income, median household income, value, driving distance to dealership, length of residency, etc. HRI uses the formula and other variables (weather, market saturation, etc.) to ensure its mail reaches the target audience. *Id.* HRI also explained in further detail it's organizational, management, and compensation structure. *Id.* at 5-8.

At no time did Stevenson disclose any of HRI's trade secrets to Lakeland. Faison Aff. at ¶¶ 20-21. At no time has Lakeland discovered any of HRI's trade secrets. *Id.* at ¶ 23. Lakeland has never used any of HRI's trade secrets. *Id.* at ¶ 24. At no time did Stevenson discuss any of HRI's current or former clients with Lakeland. *Id.* at ¶ 22. At no time did Lakeland discuss with Stevenson the Client Agreement between HRI and Lakeland. Faison Aff. at ¶ 26. At no time did

Lakeland discuss with Stevenson any agreement between HRI and Stevenson. *Id*. at ¶ 27.

Hopkins has been part owner of HRI since 2007. Hopkins Depo. at 5:13-18. He testified that Stevenson had jeopardized his contract with HRI on another occasion by working for a client to which HRI introduced him. According to Hopkins, HRI has a judgment against Stevenson that has never been pursued. *Id.* at 48:7-49:11. Hopkins testified that within one month after the conclusion of the sale that Stevenson worked for Traffic Jam, Faison told Hopkins that he did not hired Stevenson; that he hired Traffic Jam, and Traffic Jam had sent Stevenson. *Id.* at 61:6-14. Hopkins never called Traffic Jam. *Id*. at 61:24-25.

Hopkins is not alleging that Stevenson took HRI's trade secrets with him and that Lakeland hired him. *Id.* at 72:9-73:10. According to Hopkins, Traffic Jam hired Stevenson; he showed up at a sale for Lakeland, employed for Traffic Jam. *Id*. at 73:6-10. Hopkins had "no idea" what HRI trade secrets Lakeland might be using. *Id*. at 73:11-14. Hopkins testified he is not worried about Lakeland Motors disclosing trade secrets to competitors. *Id*. at 59:19-21.

Charles Bergen also worked as a team member. Hopkins Depo. at 61:2-3. According to Bergen, Lakeland utilized their team, along with the process that HRI had put in place for its teams. Lakeland hired Stevenson, "somebody [HRI] spent a lot of time, money, and training on." Bergen Depo. at 58:6-20. According to Bergen, if Lakeland did not hire Stevenson, Lakeland would had to have continued doing business with HRI. *Id*. at 64:13-15.

Stevenson had several relationships that HRI had "placed with him that stopped doing business when" the relationship between HRI and Stevenson was severed. *Id*. at 60:6-9. One such company was Gwatney, but Bergen did not know if Lakeland had anything to do with Gwatney. *Id*. at 60:10-19.

According to Chad Rains, the General Manager of HRI, Stevenson never signed any kind

of agreement or contract with HRI but "they were produced to him on every occasion that he did

. . . an event." Rains Depo. at 54:6-24; HRI's Amended Answers to Interrogatories at 10.

Stevenson's job title when HRI hired him was team leader. Rains Depo. at 55:9-11. His

responsibilities were to provide a team of salesmen and managers to a specific event. *Id*. at 55:

12-14. According to Rains, Stevenson was compensated for an event he did at Lakeland within

one month after HRI "provided a sale for him at Lakeland Motors." *Id.* at 59:6-17.

> Q: And so you're saying that Lakeland hired Undrae Stevenson by March of 2014?
>
> A: Roughly. He was working at an event in Lakeland within the month after that contract was . . . finished.

*Id*. at 59:21-25. Rains was not sure if Stevenson was hired by Lakeland. He believed it was

Traffic Jam who hired Stevenson. *Id*. at 60:1-25.

**2.      HRI's evidence**

Under the Local Rules, any response to a motion for summary judgment must include a

response to the Statement of Undisputed Material Facts, a response to the Statement of Issues,

and a concise statement of the reasons in opposition to the motion and a citation of the

authorities upon which the opposing party relies. Local Rules 56(b), 7(d). HRI did not include a

response to Lakeland's Statement of Issues as required by Local Rules 7(a)(1) and 56(b).

Because HRI has not properly disputed Lakeland's Undisputed Material Facts, the Court could

assume these facts are true. Local Rule 56(c). However, the Court will consider the evidence

presented in HRI's response.

In response to Lakeland's motion, HRI attached the Affidavit of Jeff Johnson, a

consultant for HRI; the two contracts between HRI and Lakeland; and Faison's deposition

transcript in its entirety, without pointing the Court to specific sections therein. This is also

improper. "The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his or her claim." *Ragas v. Tennessee Gas Pipeline Co.,* 136 F.3d 455, 458 (5th Cir. 1998). Rule 56 does not impose upon the court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment. *Id.* (quotations and citation omitted). The Court, having sifted through the evidence attached to HRI, gleaned the following from the evidence attached to HRI's response.

The contracts between HRI and Lakeland contain the following provision:

**10.)   HRI proprietary rights for material and personnel.**
  a.    Client agrees that all HRI materials, ad themes, promotion methods, forms and processes are proprietary, must be kept confidential by Client, and not used without the written consent of HRI.
  b.    Client agrees to compensate HRI $500,000.00 as liquidated damages (agreed by Client to be fair and reasonable) if the Client retains or hires a HRI employee or independent contractor during the 12 month period following the termination of this agreement. The parties expressly acknowledge that liquidated damages (i) have been include because of the difficulties of proving actual damages, and the inconvenience or nonfeasibility of otherwise obtaining an adequate remedy, (ii) are a reasonable forecast of just compensation for the breach and are reasonable in light of the anticipated or actual harm caused by the breach and (iii) are not intended, and shall not be construed as any type of penalty.
  c.    Client agrees to not compensate any HRI employees, independent contractors or affiliates outside of the terms of this agreement.

HRI Appx. 011.

Jeff Johnson has worked for HRI as a consultant since 2013 advising the executives on issues of business strategy, marketing, financials, etc. Johnson Aff., ¶ 2. As part of HRI's services, HRI provides "highly skilled and trained sales associates that we bring to a dealer such as Lakeland Motors to help assist with the sale of these vehicles." *Id.*, ¶ 4. According to

Johnson,

> Because we provide highly trained, unique and experienced personnel, we ask that our customers, as with Lakeland Motors, execute a provision in the contracts which provide[s] that they cannot retain or hire a HRI employee or independent contractor during the 12 month period following the termination of the 12 agreements. We include a liquidated damages clause provision of $500,000.00, which Lakeland agreed to, because of the difficulty in proving the significant damages HRI suffers when our trained personnel are used by our customers. Our clients, like Lakeland, agree not to compensate any HRI employees, independent contractors or affiliates outside the terms of the agreement.

*Id.*, ¶ 5. Randall Faison agreed that language is common in these kinds of contracts. Faison Depo. at 30:7-16.

Johnson states Lakeland agreed to the terms of the contract, but it still hired and/or retained one of HRI's members (Stevenson) after HRI had performed the services at a sale event. *Id.*, ¶ 6. According to Johnson, it is "well known in this industry that car dealers such as Lakeland Motors will try to circumvent these provisions by intentionally retaining, compensating or hiring these highly trained personnel, same situation happened here." *Id.*, ¶ 8. Johnson states Lakeland retained, hired, and compensated Stevenson and benefitted from the training and skills HRI took "many years to develop with Undrae Stevenson." *Id.*, ¶ 9.

Faison testified he negotiated Lakeland's contract with HRI. Faison Depo. at 16:2-13 & 22:10-14. HRI was expected to "bring a closer, salespeople, a desk guy to help sell used cars" at the staffed event. *Id.* at 23:21-24:2. Faison testified he was responsible for setting up the tent and delivering the vehicles for the January – February 2014 sales event, and other Lakeland personnel also staffed the event to sell the used cars. *Id.* at 23:7-20 & 24:3-5. Faison is familiar with Stevenson and testified he was part of the staffing HRI brought to the event. *Id.* at 24:6-13. According to Faison, Stevenson's job was "desking, working the deals, working the numbers." *Id.* at 24:23-25:3.

Faison testified Lakeland has done business with a company called Traffic Jam. *Id.* at 31:22-24. Traffic Jam has worked with both onsite and offsite sales events with Lakeland. *Id.* at 52: 14-17. Faison stated he had worked with Traffic Jam before HRI. *Id.* at 66:21-23. Traffic Jam is not an employee of Lakeland and Faison "guesses" Traffic Jam is treated like an independent contractor. *Id.* at 74:13-22.

When Lakeland contracted with Traffic Jam for one of these staffed events, Stevenson showed up as a "team leader for Traffic Jam." *Id.* at 32:14-19 & 44:1-4. Stevenson worked at least several times as team leader with Traffic Jam, but Faison could not recall the exact dates. *Id.* at 37:2-4. Later, Faison stated there were about "six events where Mr. Stevenson was a team leader for Traffic Jam," but again he could not recall offhand what years those events occurred. *Id.* at 41:17-42:5. According to Faison, Stevenson did work as a team leader for Traffic Jam at a Lakeland sales event following the termination of HRI's agreement with Lakeland. *Id.* at 53:6-16. Stevenson has not worked with Lakeland in any other capacity or on behalf of any other company other than Traffic Jam. *Id.* at 52:18-21.

In Faison's personal experience, a team leader at Traffic Jam would be doing the same kind of duties as Stevenson was doing for HRI, i.e. desking. *Id.* at 32:24-33:4. One of the responsibilities of a team leader would be to find other salespersons for an event. *Id.* at 40:18-25. As a team leader, Stevenson would select some of the salespeople to work the sales event and direct and train/coach them in sales. *Id.* at 70:15-25 & 82:8-15. According to Faison, someone doing the desking would not necessarily have to know how a particular dealership is pricing their vehicles, and he would not have to know about marketing/advertising methods. *Id.* at 34:11-19. A "good desking person" would know what banks loan money for cars, and he would use a computer program at Lakeland (specifically Dealertrack) to submit a loan electronically. *Id.* at 35:16-36:12. A person

doing the desking would know about pack numbers and the purchase price of cars. *Id.* at 56:5-16. The only confidential information Faison would get from a team leader would be "sales and numbers as far as how many units and what the grosses were." *Id.* at 81:7-12.

Lakeland never paid Stevenson directly for any services he provided as a team leader for Traffic Jam. *Id.* at 45:18-21. Faison testified he never contacted Stevenson to schedule a sales event with Traffic Jam. *Id.* at 46:1-3. At the time Stevenson worked for Lakeland, Faison knew he worked for Traffic Jam; he did not know if Stevenson worked with anybody else. *Id.* at 82: 2-4.

Faison did not agree that hiring Traffic Jam with Stevenson as a team leader violated Lakeland's agreement with HRI. *Id.* at 58:21-24. Stevenson never discussed with Faison any methods or processes of HRI or provide Faison any documents or emails that include people from HRI. *Id.* at 60:5-18.

## V. DISCUSSION

### A. HRI's conspiracy to commit interference claim

### 1. Assertions

According to Lakeland, HRI alleges Lakeland and Stevenson conspired to (1) interfere with the relationship between HRI and Gwatney Chevrolet (and possibly another HRI client);[5] or (2) interfere with the relationship between Stevenson and HRI; or (3) interfere with the relationship between HRI and Lakeland. Lakeland asserts HRI cannot prove Lakeland engaged in conspiracy to commit interference for the following reasons

- there is no evidence Lakeland had knowledge of an alleged conspiracy, one of the essential elements of a conspiracy, and

---

[5] According to Jeff Johnson, Stevenson took the Gwatney Chevrolet account from HRI, but it had nothing to do with Lakeland. Johnson Depo. at 26:18-24. Randy Faison, the general manager of Lakeland, has never heard of Gwatney Chevrolet, nor has he discussed Gwatney Chevrolet with Stevenson. Faison Aff. at ¶ 25; R. Faison Depo. at 49:16-21.

- there is no existing or potential contract subject to interference, and a party cannot tortiously interfere with its own contract.

## 2.      Applicable law

"Civil conspiracy is defined as 'a combination of two or more persons to accomplish an unlawful purpose, or to accomplish a lawful purpose by unlawful means.'" *Walsh v. Am.'s Tele-Network Corp.*, 195 F. Supp. 2d 840, 850 (E.D. Tex. 2002) (quoting *Tilton v. Marshall,* 925 S.W.2d 672, 681 (Tex.1996)); *Ernst & Young, L.L.P. v. Pacific Mut. Life Ins. Co.*, 51 S.W.3d 573, 583 (Tex. 2001). The elements of conspiracy are (1) two or more persons; (2) an object to be accomplished; (3) a meeting of minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result. *Operation Rescue–Nat'l v. Planned Parenthood of Houston & S.E. Tex., Inc.*, 975 S.W.2d 546, 553 (Tex. 1998).

There is no independent liability for civil conspiracy. *Deaton v. United Mobile Networks, L.P.*, 926 S.W.2d 756, 760 (Tex. App.–Texarkana Apr. 17, 1996), *aff'd, in part, rev'd, in part, on other grounds*, 939 S.W.2d 146 (Tex. 1997) (per curiam). To prevail on a civil conspiracy claim, the plaintiff must show the defendant was liable for some underlying tort. *Hunt v. Baldwin*, 68 S.W.3d 117, 133 (Tex. App.–Houston [14th Dist.] Aug. 2, 2001, no pet.).  Because a defendant's liability depends upon its participation in some underlying tort for which the plaintiff seeks to hold the defendant liable, conspiracy is considered a derivative tort. *Walsh,* 195 F. Supp. 2d at 850-51 (citing *Tilton*, 925 S.W.2d at 681).

HRI alleges the underlying tort in this case is tortious interference with a contract. To prevail on a claim for tortious interference with a contract, a plaintiff must prove the following elements: (1) an existing contract subject to interference; (2) a willful and intentional act of interference with the contract; (3) that proximately caused the plaintiff's injury; and (4) caused

actual damages or loss. *Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.*, 29 S.W.3d 74, 77 (Tex. 2000).

**3.      Analysis**

Lakeland produced the following evidence, demonstrating HRI has not produced evidence showing an existing (or potential) contract subject to interference. Scott Hopkins, part owner of HRI, denied that Lakeland interfered with other customers' contracts.  Hopkins Depo. at 11:19-25.  Jeff Johnson, an employee of HRI, testified he did not know of any contracts between HRI and someone else that Lakeland would have interfered with. Johnson Depo. at 25:8-11.  According to Johnson, a lot of clients like Stevenson, and it became "a little more difficult" for HRI to "close them on new sales" because Stevenson was not coming.  *Id*. at 25:16-22.  Johnson stated it is "hard to lose one of your best players on your team and still be successful. . . . [S]o Undrae's decision, or Lakeland or whomever was responsible for this, . . . it did detrimentally affect HRI."  *Id*. at 26:1-7.

In its response, HRI did not specifically address its claim for conspiracy to interfere with a contract, much less specifically identify evidence creating a genuine issue of material fact on the matter. This is not sufficient to preclude summary judgment.

The Court was able to glean from the evidence the following alternatives to HRI's primary allegation that Lakeland interfered with HRI's relationships with its customers: (1) Lakeland and Stevenson interfered with Stevenson's contract/relationship with HRI; and/or (2) Lakeland and Stevenson interfered with Lakeland's relationship with HRI.   When asked what evidence HRI intends to produce in support of the allegation that Lakeland is liable to HRI for conspiracy to commit interference with HRI's contracts, Hopkins pointed to the contract between HRI and Lakeland and Stevenson's contract with HRI.  Hopkins later testified as follows:

Q: [I]n the petition, HRI is saying that Lakeland Motors and Randy Faison got together and interfered with HRI's contracts with other people.

A: No.

Q: That's not what you're saying?

A: I'm saying they interfered with Undrae Stevenson.

Q: So . . . you're not saying that Lakeland Motors interfered with a contract between you and anyone else?

A: I'm saying that the way that comes into play is Undrae Stevenson was a team leader for a long period of time, for HRI, and. . . in turn produced a lot of revenue, with his ability and his team's ability; and because of Lakeland Motors and Undrae Stevenson voiding this contract, we lost Undrae Stevenson, which, in turn, cost us a lot of business around the United States.

*Id.* at 74:2-22.

Similarly, Bergen agreed that Stevenson stole HRI's relationship with Lakeland. Bergen Depo. at 54:17-24. Later, Bergen testified the damage HRI has sustained in the loss of revenue from the relationship between HRI and Lakeland as well as the loss of a relationship with the team HRI spent a lot of money building. *Id.* at 64:18-23.

Both of these alternatives fail, however, because a party cannot tortiously interfere with its own contract. *Hussong v. Schwan's Sales Enters., Inc.*, 896 S.W.2d 320, 326 (Tex. App.– Houston [1st Dist.] Mar. 9, 1995, no writ) (op. on reh'g); *Schoellkopf v. Pledger*, 778 S.W.2d 897, 902 (Tex.App. – Dallas 1989, writ denied). Even assuming HRI had produced sufficient evidence to create a genuine issue of material fact as to the underlying tort, interference with a contract, Lakeland further asserts there is no evidence of a meeting of the minds between Stevenson and Faison with regard to the alleged interferences.

"Civil conspiracy requires specific intent. For a civil conspiracy to arise, the parties must be aware of the harm or the wrongful conduct at the beginning of the combination or agreement.

One cannot agree, expressly or tacitly, to commit a wrong about which he has no knowledge." *Firestone Steel Prods. Co. v. Barajas*, 927 S.W.2d 608, 614 (Tex. 1996) (internal citations omitted). Where one party has no knowledge of the alleged object to be accomplished, there can be no meeting of the minds on the object or course of action.

Lakeland denied possessing any communication between Stevenson and any other person or entity involved with HRI. Lakeland's Response to HRI's Request for Production No. 45. (Docket Entry # 53, Exh. 12). Hopkins testified that other than Gwatney Chevrolet, there are no other business relationships between HRI and a customer or potential customer that he believes were interfered with by Lakeland Motors. Hopkins Depo. at 76:12-16. The same testimony was given by Jeff Johnson, an employee of HRI. Johnson Depo. at 25:8-11. Stevenson did not discuss any of HRI's clients with Faison. Nor did he discuss what dealerships HRI had worked with in the past. Faison Depo. at 64:18-24. Faison also attested he was not aware of any relationship between HRI and Gwatney Chevrolet, and he never discussed Gwatney Chevrolet with Stevenson. *Id.* at 49:16-21. HRI's witness Charles Bergen stated that Stevenson working for Gwatney Chevrolet had nothing to do with Lakeland Motors. Bergen Depo. at 60:17-19; Johnson Depo. at 26:8-27:6.

In sum, there is insufficient evidence to create a genuine issue of material fact regarding the element of a willful and intentional act of interference with any contract. HRI has not produced sufficient evidence to create a genuine issue of material fact as to the underlying tort, interference with a contract. Even if it could, without a meeting of the minds or a common object to be accomplished, HRI cannot prove the required elements of conspiracy. For these reasons, Lakeland is entitled to summary judgment on HRI's conspiracy to commit interference claim.

**B.** **HRI's misappropriation of trade secrets claim**

**1.** **Assertions**

In its Original Petition, HRI alleges Lakeland misappropriated HRI's trade secrets by acquiring, disclosing, or using them and having actual knowledge that the trade secrets were acquired by improper means. Orig. Pet., ¶ 20. Specifically, HRI claims Stevenson and Lakeland "misappropriated proprietary information of HRI, including confidential customer lists, pricing information, promotional methods for print and electronic media, policies and procedures regarding training sales managers and personnel, billing practices, accounts receivables, and client relationships gained only through HRI business development." *Id*., ¶ 14. HRI alleges it has been proximately injured by Lakeland's misappropriation of its trade secrets. *Id.*

According to Lakeland, HRI's claim for misappropriation of trade secrets fails because HRI cannot prove Lakeland discovered or used HRI's trade secrets, which are essential elements of misappropriation.

**2.** **Applicable law**

Under Texas law, to succeed on a claim of misappropriation of trade secrets, a plaintiff must demonstrate: (1) the existence of a trade secret; (2)  breach of confidential relationship or improper discovery of the trade secret; (3) use of the trade secret; and (4) damages. *Bohnsack v. Varco, L.P.*, 668 F.3d 262, 279 (5th Cir. 2012). To qualify as a trade secret, the subject matter involved must be a secret. *Metallurgical Indus. v. Fourtek, Inc.*, 790 F.2d 1195, 1199 (5th Cir. 1986).  Matters of general knowledge in an industry cannot be appropriated by one as his secret. *Id*.

The Fifth Circuit has used the Restatement test to determine what constitutes a "use:"

> Any exploitation of the trade secret that is likely to result in injury to the trade secret owner or enrichment to the defendant is a 'use' under this Section. Thus, marketing goods that embody the trade secret, employing the trade secret in manufacturing or production, relying on the trade secret to assist or accelerate research or development, or soliciting customers through the use of information that is a trade secret . . . all constitute 'use.'

*Gen. Universal Sys. v. HAL, Inc.* 500 F.3d 444, 450 n. 4 (5th Cir.2007) (interpreting Texas law) (quoting Restatement (Third) of Unfair Competition § 40 cmt. C).

**3.     Analysis**

The General Manager of Lakeland represents Lakeland never discovered or used any of HRI's trade secrets.  Faison Aff ¶¶ 20-21. At no time has Lakeland discovered any of HRI's trade secrets. *Id*. at ¶ 23.  Lakeland has never used any of HRI's trade secrets. *Id*. at ¶ 24. At no time did Stevenson discuss any of HRI's current or former clients with Lakeland. *Id.* at ¶ 22. At no time did Lakeland discuss with Stevenson the Client Agreement between HRI and Lakeland. Faison Aff. at ¶ 26. At no time did Lakeland discuss with Stevenson any agreement between HRI and Stevenson. *Id*. at ¶ 27. During his deposition, Faison denied ever discussing HRI's processes, methods, or clients with Stevenson. Faison Depo. at 60:4-18.

HRI did not address its claim for misappropriation of trade secrets in its response, except to say that it seeks recovery for this cause of action.  HRI's failure to respond at all, and its failure to specifically identify evidence to rebut Lakeland's evidence that it never received or used any of HRI's trade secrets, is insufficient to withstand summary judgment. What is more, the Court has sifted through the evidence of record, and not one of HRI's witnesses, when asked during deposition, could identify support for HRI's allegation that Lakeland ever discovered or used any of HRI's trade secrets.  When asked which trade secret HRI alleges Lakeland was

using, not one HRI witness was able to specifically identify any alleged trade secret actually discovered or used by Lakeland Motors.

Hopkins, co-owner of HRI, stated he "[had] no idea" what trade secrets that Lakeland was allegedly using. Hopkins Depo. at 73:11-14. He testified he was not worried about Lakeland disclosing its trade secrets to competitors. *Id*. at 59:19-21. Hopkins confirmed Stevenson had knowledge of certain HRI marketing materials (i.e. trade secrets), but he denied Stevenson took trade secrets from HRI. *Id.* at 72:9-22.

Bergen testified that Lakeland allegedly misappropriated HRI's trade secrets by utilizing HRI's team and the process HRI had put in place for the teams. Bergen Depo. at 58:1-11. However, when asked whether HRI was accusing Lakeland of using HRI's trade secrets by itself or was it all through the HRI team, Mr. Bergen responded he did not know. *Id*. at 58:12-17 (Q: So are you saying that Lakeland Motors by itself used any of your trade secrets, or was it all through the HRI's team? A: Yeah. Because I don't know what Lakeland did other than – I can't speak on their behalf….). With regard to documentary evidence in support of its trade secrets allegation, Bergen did not point to any specifics except to reference "several accounts, relationships" HRI had placed with Stevenson that had stopped doing business with HRI when Stevenson left the company. *Id.* at 60:3-9.

Lakeland is entitled to summary judgment on HRI's misappropriation of trade secrets claim.

## C.      HRI's breach of contract claim

### 1.      Assertions

HRI's breach of contract claim against Lakeland is premised on the allegation that Lakeland hired or compensated Stevenson. Lakeland does not deny it hired Traffic Jam to run a

sales event subsequent to the agreement with HRI; however, Lakeland claims it did not breach the contract with HRI because it never retained, hired, or compensated Stevenson as provided in the Client Agreement. According to Lakeland, HRI has admitted Lakeland did not hire Stevenson and has provided no evidence that Lakeland ever compensated Stevenson.

2.     **Applicable Law**

The elements of a claim for breach of contract are: (1) the existence of a valid contract; (2) the plaintiff's performance under the contract; (3) the defendant's breach of the contract; and (4) damages as a result of the breach. *Lewis v. Bank of Am. NA*, 343 F.3d 540, 544-545 (5th Cir. 2003).

3.     **Analysis**

The Client Agreement between HRI and Lakeland provides as follows: "Client [Lakeland] agrees to compensate HRI $500,000 as liquidated damages (agreed by Client to be fair and reasonable) if the Client retains or hires a[n] HRI employee or independent contractor during the 12-month period following termination of this agreement. . . ." The Client Agreement further states that "Client agrees to no compensate any HRI employees, independent contractors or affiliates outside of the terms of this agreement." Hopkins & Raines Inc. Client Agreement at ¶10. The Client Agreement neither defined the scope of retention or compensation, nor specified whether Lakeland was also prohibited from retaining, hiring or compensating a third party who had employed a former HRI contractor within the twelve month timeframe.

HRI claims Lakeland breached this provision when it hired Traffic Jam, who employed Stevenson as an independent contractor for sales events at Lakeland. Faison, the General Manager of Lakeland, confirmed Stevenson worked approximately six events with Lakeland; however, he states Lakeland contracted with Traffic Jam, a company with whom Lakeland had a

continuing relationship since as early as 2009, directly and compensated Traffic Jam. Faison Aff. at ¶¶ 6, 13; Faison Depo. at 32:5-13. For each staffed sales event that Traffic Jam performed for Lakeland, Lakeland had no control over training or compensation of Traffic Jam's independent contractors, including Stevenson. Faison Aff. at ¶ 14.

At no time did Lakeland have any contact with Stevenson where he was retained or hired by Lakeland. *Id.* at ¶ 19. There were no oral or written agreements between Stevenson and Lakeland. *See* Lakeland's Verified Response to HRI's Interrogatory No. 2. Lakeland denied having any accounts from which funds have been transferred to Stevenson. *See* Lakeland's Verified Response to HRI's Interrogatory No. 5. Lakeland further refuted having produced any IRS forms and tax statements to Stevenson. *See* Lakeland's Response to HRI's Request for Production No. 10 (Docket Entry No. 53, Exh. 9).

Chad Rains, HRI's corporate representative, stated he believed that Stevenson was hired by Traffic Jam – not Lakeland Motors. Rains Depo. at 60:19-25. Scott Hopkins, fifty percent owner of HRI, stated that after Stevenson left HRI, Stevenson was hired by Traffic Jam. Hopkins Depo. at 73:4-10. Hopkins further confirmed that when asked, he was told the same thing by Faison. *Id.* at 61:9-14. Furthermore, HRI's verified response to Lakeland Motors' Interrogatory No. 11 unequivocally states that "they [Lakeland Motors] didn't hire Dre [Undrae Stevenson], they hired Traffic Jam." *See* HRI's Verified Response to Lakeland's Interrogatory No. 11.

In his affidavit, Jeff Johnson states it is "well known in this industry that car dealers such as Lakeland Motors will try to circumvent these provisions by intentionally retaining, compensating or hiring . . . highly trained personnel." Johnson Aff., ¶¶ 8-9. HRI never put forth any evidence supporting Johnson's assertion that this same situation happened here. The text

messages submitted by HRI allegedly show conversations between Stevenson and Faison beginning in February of 2015. Stevenson informed Faison "it [has] been well over a year for my employment with HRI." There was no affirmative response from Faison as evidenced by Stevenson's repeated inquiries for status updates through July of 2015.

Lakeland bears the initial burden to demonstrate the absence of any genuine issue of material fact. *Celotex*, 477 U.S. at 332. Lakeland has carried its burden, requiring HRI to "respond to the motion for summary judgment by setting forth particular facts indicating there is a genuine issue for trial." *Byers*, 209 F.3d at 424 (citing *Anderson*, 477 U.S. at 248-49). HRI has failed to adduce affirmative evidence indicating there is a genuine issue for trial. HRI has presented no evidence that Lakeland ever hired or retained Stevenson, and in fact has admitted this is not true. There is also no evidence Lakeland ever compensated Stevenson. For these reasons, Lakeland is entitled to summary judgment on HRI's breach of contract claim.

Based on the foregoing analysis, it is hereby

**ORDERED** that Counter-claim Defendant Hopkins & Raines, Inc.'s "No-Evidence" Motion for Summary Judgment (Docket Entry # 48) is **DENIED**. It is further

**ORDERED** that Defendant Lakeland Motors' Motion for Final Summary Judgment (Docket Entry # 53) is **GRANTED**. It is further

**ORDERED** that Hopkins & Raines, Inc.'s claims against Defendant Lakeland Motors d/b/a Lakeland Chrysler Dodge Jeep are **DISMISSED WITH PREJUDICE**.

**SIGNED this 18th day of July, 2016.**

CAROLINE M. CRAVEN
UNITED STATES MAGISTRATE JUDGE

24